UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE NO. 3:10-CR-151

UNITED STATES OF AMERICA                                                  PLAINTIFF

v.

RONTEZ P. COLBERT                                                          DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court upon Defendant's Motion for Suppression and *Franks* Hearing (Docket #24). The government has responded (Docket #31). A hearing was held on April 21, 2011. The parties have filed supplemental briefs (Docket # 44, 46). This matter is now ripe for adjudication. For the following reasons, Defendant's motion is DENIED.

**BACKGROUND**

On October 25, 2010, police officers observed Defendant Rontez P. Colbert in Victory Park in Louisville, Kentucky. Detective Ryan Nichols, who works within the police department's street-level narcotics unit, performs frequent surveillance in the Victory Park area, which is known for drug trafficking, violent crime, and gang activity. He describes the Victory Park area as "an open-air drug market within the city." Supp. Hrg. Transcript, DN 40, p. 8. Detective Nichols also noted that he had observed hand-to-hand drug transactions in and around Victory Park.

Officers first observed Defendant in Victory Park at approximately 5:00 p.m. Detective Nichols was in a vehicle performing surveillance with Detective Mickey King. The officers observed Defendant "approaching people on foot and vehicles that would pull through that area of the park, had a short interaction with them, and then would return either over to maybe – there's a picnic table on that corner of the park or back over by his vehicle." *Id.* at 11. This

activity continued for approximately thirty minutes, with Defendant approaching approximately ten to fifteen people, until Defendant left the park in his vehicle and traveled to a residence. The officers followed Defendant and observed him enter the residence for five to ten minutes, return to his vehicle, and drive back to Victory Park. Detective Nichols testified that he recognized Defendant's vehicle, and knew the residence's address to be associated with Defendant, but did not verify Defendant's identity until the traffic stop that occurred at a later time.

After returning to Victory Park, Defendant engaged in the same type of conduct observed previously by the officers. Again, Defendant met with ten to fifteen people for approximately thirty to forty-five minutes before returning to the residence. He stayed there for five to ten minutes the second time before returning to Victory Park. Officers observed the same activity, and Detective Nichols noted that "[h]is activity in and around the park was consistent with hand-to-hand drug sales." *Id.* at 15. Detective Nichols could not see drugs exchanged for money from his surveillance point.

After Defendant returned to his vehicle for a third time and left the park, the officers conducted a traffic stop because Defendant failed to use his turn signal. This stop occurred at approximately 6:30 p.m. Detective Nichols acknowledges that Defendant was stopped for the traffic violation and because of the ongoing narcotics investigation.

Defendant pulled over his vehicle and Detective Nichols pulled up behind him. Defendant started to get out of his vehicle but Detectives Nichols and King told him to remain in his vehicle. Detective Charles Louden, who had also been on surveillance, pulled his vehicle in front of Defendant's with the intention of blocking off his car. Detective Nichols testified as to his initial encounter with Defendant:

2

> We got up there, asked him for his driver's license, registration, asked him if he owned the car. He provided his documentation, acted like he still wanted to get out of the car. I said it was fine if he got out of the car.
>
> He stepped out of the car at that time. When he did get out of the car, we did a pat-down search to make sure he wasn't armed, didn't find any weapons on him, and then continued with our investigation. Ran Mr. Colbert for warrants, checked the status of his driver's license.
>
> Another unit pulled up, as well, because they knew we had conducted the traffic stop. I believe that detective called for a K-9 narcotics unit to respond to the scene.

*Id.* at 17-18. Detective Nichols explained that Defendant was frisked because people don't normally exit their car during a traffic stop. "Quite often, if they do, they're fleeing or trying to distance themselves from something in the vehicle." *Id.* at 18. Detective Nichols was also familiar with Defendant as a Victory Park Crip gang member, a group associated with violence and the open-air drug market. "Quite often, narcotic traffickers will be armed to protect themselves and their money or drugs." *Id.* Defendant was not handcuffed. He stood beside his car or sat on some nearby steps.

Detective Nichols asked Defendant if there was anything in his vehicle that the officers needed to know about or that he should not have. Defendant said no and then refused consent to search the vehicle. According to Detective Louden, the K-9 unit arrived approximately ten to fifteen minutes after the initial traffic stop. Detective Nichols spoke to the K-9 officer, who took the dog around the exterior of the vehicle. The dog did not alert on anything.

> At that time, I re-approached Mr. Colbert. He was still sitting on the step by the store. And I said to him, I said, "Are you sure there's nothing in your vehicle? You just saw the K-9 drug dog run around your car. Do you have anything in your vehicle that you need to tell me about?"
>
> And he replied that there was a marijuana blunt in the backseat –

3

*Id.* at 20. Detective Nichols then opened the rear driver's side door of the vehicle and asked Defendant to direct him to the blunt.

> He started telling me to lean over towards the ashtray. As I leaned in the vehicle, there was no marijuana blunt or cigarette, but there was a baggie of marijuana on the seat.

*Id.* at 21. Detective Nichols had the K-9 officer run his dog through the interior of the vehicle. The dog indicated on a sweat jacket pocket in the open cargo area of the vehicle. When the K-9 officer leaned in to observe the jacket, he saw a handgun. The officers seized the handgun from the vehicle. Defendant was arrested and placed in handcuffs between approximately 7:15 to 7:30 p.m. He was then placed in a marked car to be transported to the police station.

At the station, Defendant was interviewed by ATF Agents Justine Demaree and Kevin Funke, who had been contacted by Detective Nichols during the traffic stop and had arrived on the scene following the search of the vehicle. Detective Nichols prepared a narcotic search warrant for the residence that Defendant had visited. Other officers were sent to the residence to prevent anyone from entering. After Detective Nichols obtained a search warrant, he and several other officers searched the residence and "recovered marijuana, some of which was packaged similarly to the marijuana we recovered from the vehicle, digital scales, codeine syrup, crack cocaine, baggies to package the narcotics in. We also recovered four firearms from the location, two of which were stolen." *Id.* at 27.

On November 17, 2010, Colbert was indicted and charged with violating 18 U.S.C. §§ 922(g)(1), 924(e)(1), and 924(a)(2) by being a felon in possession of a firearm. Colbert filed his motion to suppress and for a *Franks* hearing on January 27, 2011. A hearing was held in Louisville on April 21, 2011. At the hearing, Detectives Ryan Nichols, Charles Louden, and

4

Justin Demaree testified. The parties thereafter filed briefs on the issue of suppression. The Court now considers Defendant's motion.

## DISCUSSION

Defendant presents three arguments as to why the evidence in this case should be suppressed. First, Defendant argues that the police unlawfully expanded the scope and duration of the traffic stop without reasonable suspicion that Defendant was committing a drug crime. Defendant also asserts that this prolonged detention was unreasonably long because any reasonable suspicion was dispelled when the K-9 drug dog did not alert after walking around Defendant's vehicle. Accordingly, any further questioning was unreasonable and violated Defendant's Fourth Amendment rights. Finally, Defendant argues that the police violated his Fifth Amendment rights by questioning him about marijuana in his vehicle after the first drug dog sniff without informing Defendant of his *Miranda* rights. Thus, the marijuana and gun found in the car should be suppressed as fruit of the poisonous tree. The Court now considers Defendant's arguments.

### I.  Scope and Duration of the Traffic Stop

Neither party disputes that Defendant was lawfully pulled over for committing a traffic violation. "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993). The officer's subjective motivation for making the stop is irrelevant. *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002) (citations omitted). In this case, police officers observed Defendant's failure to use his turn signal in violation of Kentucky Revised Statutes section 189.380(1) and (2).

Thus, the initial stop was lawful.

Even if a traffic stop is lawful, however, police officers may not detain someone after the initial traffic stop is complete unless the officers have reasonable suspicion justifying further detention. *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005); *Bailey*, 302 F.3d at 657-58. "[A]ny subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference." *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). "Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Id.*

Defendant was detained further after the initial traffic stop because the police officers had contacted a K-9 unit and were awaiting its arrival. The testimony from the suppression hearing indicates that the K-9 unit arrived approximately ten to fifteen minutes after the initial traffic stop. In *Davis*, the Sixth Circuit held that it was reasonable for police officers to detain the defendant for an additional thirty to forty-five minutes while the officers waited for the arrival of a drug-sniffing dog. 430 F.3d at 354. The court noted that the police had reasonable suspicion to believe that the defendant's vehicle contained narcotics because police observed the defendant meeting with a suspected drug dealer prior to the stop. *Id.* at 354-55. The Sixth Circuit found "no evidence in the record that the additional approximately thirty-minute delay of Davis and his vehicle while the first drug-sniffing dog was located and procured was unreasonable in light of the officers' reasonable suspicions." *Id.* at 355; *accord United States v. Branch*, 537 F.3d 328, 339 (4th Cir. 2008) (thirty minute detention was constitutional where officer "possessed a

'reasonable articulable suspicion of narcotics activity' sufficient to justify the continued detention").

In this case, police officers had reasonable suspicion to detain Defendant after the initial traffic stop. The police officers observed Defendant in Victory Park, an area known as a "open-air drug market." Defendant approached several people and engaged in behavior consistent with "hand-to-hand drug sales." He traveled to his residence at least twice and then returned to the park after a short amount of time. Officers were familiar with Defendant and knew him to be a gang member. When the traffic stop first commenced, Defendant attempted to get out of the car, which signaled to the officers that he was attempting to flee or distance himself from the vehicle. Thus, the officers had reasonable suspicion that Defendant's vehicle contained drugs. Further, similar to *Davis*, a ten to fifteen minute delay was not an unreasonable amount of time.

For these reasons, Defendant's first argument fails as a matter of law.

## II. K-9 Drug Dog Non-Alert

Next, Defendant argues that the police officers no longer had reasonable suspicion after the K-9 drug dog did not alert on his vehicle. Thus, any further questioning was unconstitutional. In support of this argument, Defendant cites to *Davis*. "Once the drug-sniffing dog was brought to the scene and failed to alert positively to the presence of narcotics in the vehicle, the officers' suspicions that Davis was in possession of narcotics were dispelled." *Davis*, 430 F.3d at 356. The Sixth Circuit held in *Davis* that delaying Davis an additional hour to permit a second examination of the vehicle by another drug-sniffing dog was unreasonable. *Id.* "The use of the second dog and the continued detention of Davis's vehicle served no investigatory purpose." *Id.* Defendant argues that this case is similar and the continued

7

investigation and interrogation of Defendant after any reasonable suspicion was dispelled violated his Fourth Amendment rights.

The biggest difference between this case and *Davis* is the amount of delay occurring after the drug dog's non-alert. In *Davis*, the defendant was required to wait an additional hour for a second drug-sniffing dog. But in this case Detective Nichols approached Defendant right after the dog did not alert and asked him if he was sure he did not have anything in his car. At this time, Defendant confessed to having a marijuana cigarette in his vehicle, providing probable cause for a search of the vehicle. This prolongation of the stop was de minimis and reasonable. *See United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010) ("[T]he proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*–including any prolongation due to suspicionless unrelated questioning–was reasonable." (emphasis in original)). Accordingly, Plaintiff's Fourth Amendment rights were not violated by Detective Nichols' questioning after the drug dog did not alert.

## III. *Miranda* Warnings

Finally, Defendant argues that the police officers violated his Fifth Amendment rights by questioning him following the dog's non-alert without giving *Miranda* warnings. Defendant further argues that because of this violation, the gun and marijuana found in the car should be suppressed as fruit of the poisonous tree.

An accused is entitled to the reading of his or her *Miranda* rights only when he or she is interrogated while "in custody." *Thompson v. Keohane*, 516 U.S. 99, 102 (1995). Interrogation is "'express questioning or its functional equivalent.'" *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980)). The Sixth Circuit

8

applies the following analysis when considering whether a suspect is in custody:

> For an individual to be "in custody," there must be "a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Thompson*, 516 U.S. at 112, 116 S.Ct. 457 (citation and internal quotation omitted). In determining whether a suspect is "in custody" for purposes of applying the *Miranda* doctrine, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984).

*United States v. Mahan*, 190 F.3d 416, 421 (6th Cir. 1999); *accord J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011).

In this case, Defendant was not placed under arrest until after the officers discovered the marijuana and firearm in his vehicle. Defendant challenges the questioning that occurred prior to this discovery. Thus, the inquiry before the Court is whether a reasonable person in Defendant's position would have felt free to terminate the interrogation and leave. Defendant was allowed to stand outside his vehicle in a public area. He moved freely from nearby steps to his car and back. *Accord United States v. Thomas*, 381 F. App'x 495, 500 (6th Cir. 2010) (no *Miranda* warnings necessary where the defendant was not restrained in a public space). He was permitted to receive calls on his cell phone. The officers did not display their weapons or use handcuffs. Based on these circumstances, the Court does not conclude that Defendant was under arrest or that his movement was restrained to the degree associated with formal arrest at the time officers questioned him about the contents of his vehicle. Accordingly, the Court finds that Defendant was not entitled to the reading of his *Miranda* rights.

## CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for Suppression and *Franks* Hearing is DENIED.